[No. 21556.   Department Two.   December 23, 1929.]

JOHN P. CARTER *et al., Respondents,* v. LOUIS MILLER,
*Appellant,* SILVER & FUREY, INCORPORATED,
*Intervener, Appellant.*[1]

[1]Reported in 283 Pac. 470.

*Crollard & O'Connor,* for appellant.

*D. A. Shiner, John W. Hanna,* and *M. V. Dougherty,* for respondents.

MILLARD, J.—The vendors commenced this action to recover the possession of, and to quiet title to, certain orchard land which is the subject-matter of a real estate contract. The complaint alleged that the purchaser abandoned the contract; that the contract was mutually rescinded, and that, for breach of the contract, the vendors, by proper forfeiture notice, forfeited the rights of the purchaser. The prayer for relief is:

"That all the rights, interest and estate of the defendants and each of them in and to the real estate described in this complaint and in and to the real estate contract herein described be declared forfeited and that the title of the plaintiffs in said real estate be quieted against any claims of right, title, interest or equity of the defendants.

"That all payments heretofore made by said defendant Louis Miller . . . on account of said contract be awarded to the plaintiffs herein in full satisfaction and liquidation of all damages by them sustained.

"That the plaintiffs be decreed the right of immediate possession of said lands and premises . . ."

The purchaser, by answer and cross-complaint, alleged a failure of consideration under which his signature was obtained to the cancellation of the contract;

alleged readiness to pay the balance due on the purchase price and prayed execution of a deed to him of the land subject to the mortgages which he assumed under the terms of the real estate contract. Silver & Furey, Incorporated, by complaint in intervention, sought recovery of fifteen hundred dollars alleged to be due on crop mortgage given by defendant Miller for a loan to him by the intervener. An injunction having issued restraining the removal of the apple crop, the defendant, as an alternative to the appointment of a receiver to harvest and sell the crop, was required to execute a bond conditioned to account for the net proceeds of the crop, and "that any judgment that may be entered against Louis Miller on account of said bond may likewise be entered against the surety thereon in this action." The court found the facts to be as alleged by the plaintiffs. From judgment of forfeiture quieting title in the plaintiff, and from personal judgment against the defendant Miller in favor of the intervener, the defendant and intervener have appealed.

On July 30, 1926, respondents Carter, as parties of the first part, and appellant Miller, as party of the second part, entered into a real estate contract for the sale by the respondents to the appellant of an eleven-acre orchard in Douglas county, Washington. Upon execution and delivery of the contract, which was not recorded, Miller went into possession of the property. The provisions of the contract material to this action are as follows:

" . . . Said land and crop thereon to be free and clear of all incumbrances except the bonded indebtedness of the Bridgeport Irrigation District and two mortgages hereinafter referred to with the appurtenances thereunto belonging on the following terms:

"1st. The purchase price for said land is sixteen thousand and no/100 dollars ($16,000) of which the sum of four thousand five hundred and no/100 dollars

has this day been paid as earnest, the receipt whereof is hereby acknowledged by said parties of the first part; and the balance of said price, to wit, the sum of eleven thousand five hundred and no/100 dollars ($11,-500) is to be paid as follows: The party of the second part assumes and agrees to pay H. C. Johnson, state supervisor of banking, liquidating the Bridgeport State Bank, a first mortgage according to the terms and conditions thereof at 7% interest from this date, also pay Theresa M. East a second mortgage, dated May 29th, 1926, and interest thereon from date of this contract at 8%, and the balance to be paid to the party of the first part on or before the 15th day of May, 1927, as evidenced by a promissory note of even date and secured by an order of Robert T. Cochran & Son, New York, N. Y., the fruit selling organization handling the apples for said second party, with interest thereon from date of this contract until paid at the rate of 8 per cent per annum, payable with the principal.

"2nd. The party of the second part shall also pay all taxes and assessments which may be levied or may accrue against said lands, or any part thereof from this day including last half of 1926 water tax. First party shall furnish an abstract to date showing good title.

"3rd. Said land to be conveyed by a good and sufficient deed to said party of the second part when said purchase price shall have been fully paid to first party free and clear of all incumbrances except mortgages and bonded indebtedness referred to above.

"4th. Time is the essence of the contract, and in case of failure of said party of the second part to make either of the payments or perform any of the covenants on his part, this contract shall be forfeited and determined at the election of said parties of the first part, and the said party of the second part shall forfeit all payments made by him on this contract, and such payments shall be retained by the said party of the first part in full satisfaction and liquidation of all damages by them sustained; and they shall have the right to reenter and take possession of said land and premises and every part thereof."

Of the purchase price of $16,000, the appellant Miller paid $4,500 when the contract was executed. The balance of $11,500 is represented by a promissory note for $325 given by Miller to the Carters, payable on or before May 15, 1927, and Miller assumed two mortgages on the property—the Johnson mortgage of $8,000, and the East mortgage of $3,200. Each mortgage contained a deficiency judgment provision under which a judgment for the deficiency would be entered against the mortgagors, the Carters, in the event that sufficient was not obtained on sale under foreclosure to satisfy the mortgage. Notes, secured by the mortgages, for the installments as due, were signed by Carter and wife.

Miller harvested the 1926 crop of fruit, and was unable, or refused to pay a note for $1,590 he had given to Silver & Furey, Incorporated. We will later refer to that note. Miller became discouraged, and that he intended to abandon the contract is evidenced by his conduct. In November, 1926, Miller obtained employment at Beebe, a town in Chelan county, where he remained until January 20, 1927. Carter testified that, on request of Miller, the family was permitted to remain until Miller could find a house for them at Beebe. Miller testified that, while he was at Beebe, respondent Carter requested him not to abandon the contract and to keep his family on the land. Miller's family remained on the premises, where Miller later rejoined them, and he and they were in possession when this action was instituted. Miller informed a number of persons in December, 1926, and in January and April, 1927, that he had abandoned the contract. However, he returned to the orchard in January, 1927, and pruned the trees.

Under the mortgage by the Carters to Johnson, and assumed by Miller under the real estate contract, pay-

ments of two thousand dollars were to be made on January 1 of each of the years 1927, 1928, 1929 and 1930. Payments under the Carter-East mortgage assumed by Miller were to be made as follows: $200 January 1, 1927; $2,000 January 1, 1931; and $1,000 January 1, 1932. Miller did not make any payments, either of interest or principal, on the notes, and he also permitted general and water taxes in excess of five hundred dollars to become delinquent.

The maturity date of the final payment of the purchase price was May 15, 1927, and, it appearing unlikely that Miller would or could pay the same when due, and having permitted the mortgage installments to become delinquent, a conference was had between Miller and the Carters which culminated in mutual cancellation of the real estate contract, Miller surrendering his copy of the contract to the Carters. Both copies of the contract bear the following indorsement, signed by the parties:

"This contract canceled and surrendered by mutual consent this 10 day of May, 1927. Louis Miller. John P. Carter."

The Carters did not return to Miller the unpaid note for the last installment of the purchase price.

A few days subsequent to May 10, 1927, Miller informed Carter that he, Miller, intended to hold the 1927 crop, "regardless of whether the payments were made or not." On May 16, 1927, the respondents served demand upon Miller for possession of the land.

"You are hereby notified to give possession of the orchard and place, as sold to you under contract, and now delinquent, within thirty days from this date, otherwise process of law will be used to regain possession."

Miller, by letter of May 19, 1927, replied as follows to the Carters:

"The copy of the contract I surrendered to you for the purpose of securing finances to clean up my pressing obligations and the growing and harvesting of the 1927 crop was not returned to me on the evening of May 17, 1927, when you advised me that it was impossible for you to complete the finance arrangements with the B. B. Orchard Co., so please return the same as I am making my own financial arrangements.

"The balance due you on our contract dated July 30, 1926, is evidenced by a note which is made payable to you at the 1st Nat. Bank, Tonasket, Washington. You and Mrs. Carter will please execute a deed subject to the terms and conditions in a certain contract dated July 30, 1926, between John P. Carter and Mindie S. Carter, as parties of the first part, and Louis Miller, the party of the 2nd part, and send this deed together with the abstract to the 1st Nat. Bank, Tonasket, Washington, and instruct the bank to deliver the deed and abstract to me upon receipt of the balance due you on the note which I believe is $325 plus 8 per cent interest from July 30, 1926."

On June 10, 1927, the Carters served upon Miller the following notice of intention to declare a forfeiture of the contract:

"On the 10th day of May, 1927, by mutual agreement that certain real estate contract . . . was canceled and surrendered by writing on the face of both copies of said contract . . .

"On or about May 19, 1927, we received from you a letter which indicates an understanding on your part that the cancellation and surrender of the real estate contract was for some purpose other than the clearing up the title and that contract.

"*In order that there may be no further misunderstanding and in order that you may have a clear and definite idea as to my intention then and as to my present intention,* please be advised that the contract which I have described above *is now in default* in the following particulars:

"(1) $2000 due on or before January 1, 1927, to H. C. Johnson, state supervisor of bank, liquidating

the Bridgeport State Bank, by reason of a first mortgage against said premises, according to the terms and conditions thereof, and together with 7 per cent interest from July 30, 1926. This mortgage is now held by Harry E. Jones, whose address is Wenatchee, Washington, and who expects this back payment to be made without further delay. If you are not going to make it I must make my own arrangements to take care of it. He is threatening foreclosure.

"(2) The second mortgage of $3200 to Mrs. Theresa M. East dated May 29th, 1926, is past due in the following particulars:

"$200 due January 1, 1927, and Interest on $3200 at eight per cent from May 19, 1926, to January 1, 1927, is in default.

"Past due taxes and water assessments.

"This letter is to advise you that *it is our intention to declare a forfeiture of that real estate contract if the above items of default are not taken care of and paid within the next thirty days,* at which time notice of default and suit to quiet title against the said contract and for immediate possession of said premises will be served upon you.

"We trust that we have made ourselves sufficiently clear in this notice so that you will have no occasion to evade these payments or to again put an interpretation upon a mutual understanding which was not intended at the time." (Italics ours.)

On July 8, 1927, Miller tendered, through his attorneys, $349.55, and demanded a deed and abstract. Miller did not pay or tender payment of the other obligations then delinquent. On July 1, 1927, the Carters paid to Harry E. Jones, to whom the Johnson mortgage had been assigned, the interest due January 1, 1927, on the mortgage.

Declaration of forfeiture was served by the Carters upon Miller July 11, 1927:

"In accordance with preliminary notice mailed to you on June 10, 1927, you are advised that the real estate contract . . . is hereby declared forfeited

and canceled for the reasons that the items of default mentioned in said notice of June 10, 1927, have not been paid by you within the thirty-day period required or at all.

"You are further notified that you are required to surrender possession of said premises immediately."

Action was instituted by the Carters for forfeiture of the contract and the quieting in them of title to the land. The order entered restraining the removal of the apple crop was modified to permit Miller to harvest and sell the apples; however, Miller was required, as an alternative to the appointment of a receiver, to execute a bond as mentioned above. Pursuant to stipulation of the parties August 20, 1927, Miller was permitted to harvest and sell the crop of pears, the net proceeds of the sale being paid by the buyer into the registry of the court. Miller kept his tender good of the balance due on the purchase price and demanded specific performance of the contract. The respondents did not, at any time, tender a deed and abstract.

Counsel for appellant contend that the judgment should be reversed because, at the time, June 10, 1927, respondents demanded performance of appellant as an alternative to the contract being forfeited, the date (May 15, 1927) fixed in the contract for the respondents' delivery of a deed had arrived; that the Carters did not then or at any time tender the deed and abstract to Miller, and they did not return Miller's note evidencing the balance owing to the Carters on the contract. Counsel further argue that the demand for performance and giving of notice of intention to declare a forfeiture were subsequent to the disputed acts relied upon as abandonment and mutual rescission, therefore the respondents are attempting to occupy inconsistent positions in claiming that the contract was terminated and at the same time recognizing the existence of the contract which the respondents

may not forfeit without tendering their deed in performance.

We are committed to the rule that if, when the last installment of the purchase price under an executory contract of sale is past due, other installments are also unpaid, the vendor can not forfeit the contract unless a deed is tendered and payment demanded. *Reese v. Westfield*, 56 Wash. 415, 105 Pac. 837, 28 L. R. A. (N. S.) 956, makes a distinction between the right of the landowner, who has contracted to give a deed on payment of the purchase price, to enforce a forfeiture where the default is made in the payment of the last installment, and where the default is in earlier installments. We there held that a tender of the deed and payment of the last installment are dependent and concurrent; that the tender of the deed is as much a part of the contract as the payment of the last installment, therefore the vendor cannot enforce a forfeiture without tender of performance on his part. But, in the case of earlier installments of the purchase price, the giving of a deed is independent of the payment of such earlier installments. In enforcing forfeiture for default in payment of the earlier installments, the vendor is not required to tender a deed. In *Reese v. Westfield, supra*, the rule is stated as follows:

"While we admit that the conditions providing for forfeiture in contracts of this character are usually held to be for the benefit of the vendor and we have hitherto, and are now, willing to give the vendor the full benefit of all the conditions of his contract, and say that all payments prior to the last payment are conditions precedent, we have no sympathy with the holding of some courts to the effect that the whole duty is upon the purchaser, and unless he tenders the last payment the vendor is entirely released from any obligation to convey or tender conveyance. The covenants are independent so long as no duty is imposed on

the vendor, but if any covenant puts both parties to action and concurs in time, it must be held to be dependent and concurrent.''

That rule, however, has no application to the case at bar. The respondents seek to regain possession of the land and have their title thereto quieted. The appellant, by cross-complaint, seeks specific performance of the contract which he admits was canceled. The testimony of the parties as to the cancellation is conflicting. The Carters' explanation of the indorsement upon the two copies of the contract is that they, the Carters, being primarily liable on all the notes, began to make arrangements for meeting the obligations, but the fruit company with which they were dealing would not lend on the 1927 crop until the real estate contract was surrendered by Miller. Miller's narration is that in May, 1927, Carter urged them to remain with the property and care for the orchard, representing to the appellant that, if he would surrender the contract for the purpose of placing the title in the name of the Carters, the Carters would be able to finance the growing and harvesting of the crop through a marketing agency, and that all crop proceeds would be applied to the payment of the taxes, assessments and the mortgage indebtedness and credited to Miller, who should have his same rights in the property and be given a contract later evidencing the same. Miller insists that he was to be paid eighty cents a box to cover needed expenditures in producing and disposing of the crop. The Carters dispute Miller's version, they maintaining that Miller was to have no further interest in the land or crop other than eighty cents a box for the growing of the crop and payment of all expenses of production. Respondent Carter admitted on cross-examination that he promised Miller a new contract if the payments due were made. Carter testified:

"A. He had already given up the place when I went to Chelan to see him, he had already given it up, and told me he would give back the contract, and said the contract wasn't on record. He said, 'there is nothing on record to show that this contract ever existed between you and I.' Q. That is, when you talked at Chelan Station, some time about the first of January or the last of December. That's when it was? A. That's when it was, yes, sir, some time about then. Q. Now, then, about the 20th or 21st of January, he went back up and had begun to prune? A. I don't know whether he began then or not. He came back with the statement that the Cochran Fruit Company were going to make the payments. Q. What did you say when he told you that? A. I said, 'That is fine. *If they come through and make those payments I will give you a new contract on the place.*' I always told him that. Q. You always told him you would give him a new contract? A. Yes, sir, I always told him I would give him a new contract."

The foregoing testimony is simply to the effect that Miller desired to surrender the contract; that he anticipated the payments would be made by the Cochran Fruit Company, in which event Carter promised Miller a new contract. Miller's hope that the Cochran Fruit Company would make the payments was not realized.

The evidence supports the findings of the trial court that the appellant abandoned the contract; that appellant was unable to make the payments as covenanted, and that the appellant and respondents mutually agreed to, and did, cancel the contract. Appellant Miller, subsequent to the mutual cancellation of the contract, repudiated the oral agreement under which he was permitted to retain possession of the land. His possession was solely for the purpose of harvesting the crop for compensation as recited above. Appellant stated he would not observe the terms of the agreement; that he would hold the 1927 crop. The letters of respondents to appellant immediately following that

threat clearly explain that the contract was canceled because of appellant's defaulting in the payment of the mortgage notes and taxes. The appellant was advised that,

"On or about May 19, 1927, we received from you a letter which indicates an understanding on your part that the cancellation and surrender of the real estate contract was for some purpose other than the clearing up the title and that contract.

"In order that there may be no further misunderstanding and *in order that you may have a clear and definite idea as to my intention then and as to my present intention,* please be advised that the contract which I have described above is now in default in the following particulars: . . .

"This letter is to advise you that it is our intention to declare a forfeiture of that real estate contract if the above items of default are not taken care of and paid within the next thirty days. . . ."

The appellant tendered payment of the final installment of the purchase price and demanded a deed "subject to the terms and conditions" of the contract, but did not tender payment of the delinquent mortgage notes and taxes.

The letter to appellant did not create any new rights in appellant. His rights under the first contract had been surrendered. That contract, by mutual consent, was terminated. There was no contract between the parties other than the second contract or oral agreement which appellant repudiated. Under that oral agreement, the only rights the appellant had were to remain in possession of the land to harvest the crop, for which services he was to be compensated.

Appellant insists that the original contract still subsists, and also argues that, under the cancellation agreement, he was to have a new contract following the application of the proceeds from the sale of the crop to the indebtedness due under the original con-

tract. It is significant that appellant made no effort to reinstate the original contract until he had repudiated the oral agreement, and provoked the respondents to commence proceedings to regain possession of the land. The effort of appellant consisted solely in offering to pay the final installment of the purchase price. That respondents were willing to reinstate the contract or make a new contract, may be conceded. Their notice to appellant that, if the items of default were not paid within thirty days (the same items of default which induced the mutual cancellation of the contract), suit to regain possession of the premises and to quiet title thereto would be commenced, may be interpreted as an offer to reinstate the contract. That offer was not accepted by appellant. That offer was appellant's opportunity to obtain a new contract. The reinstatement of the old contract would be the making of a new contract. The first contract was mutually canceled May 10, 1927, and that cancellation divested appellant of all rights he had under that contract. The appellant will not now be heard to say that the contract was not canceled. His rights were terminated. He later refused to accept the terms of the offer under which the contract could be reinstated. That offer was not a waiver of the mutual cancellation and a recognition of the contract as then existing.

Appellant complains that the facts alleged by respondents are inconsistent, being based, on the one hand, on the affirmance of the contract, and on the other, upon its cancellation, and that the court based the judgment upon the ground of forfeiture. The trial court's decree reads as follows:

"That all rights, interest and estate of the defendant Louis Miller and the intervener, Silver & Furey, Inc., a corporation, and each of them, in and to the real estate described in the complaint and in and to the real

estate contract herein described be and the same are hereby declared forfeited and that the title of the plaintiffs in said real estate be and the same is hereby quieted. . . ."

The respondents alleged the facts out of which their cause of action arose, and supported the cause by proper proof. Not having moved in the court below against the inconsistency of which he now complains, the appellant may not, for the first time, on appeal, successfully raise the question. A sufficient answer to the question whether the judgment was erroneously based upon the theory of forfeiture for breach of the conditions of the original contract, or whether the court correctly adjudged the rights of appellant forfeited by reason of the mutual cancellation of the contract, is that this is an equity case. The testimony is before us. The judgment is right and can be sustained upon the principle that all rights of appellant were surrendered by the cancellation agreement; that his retention of possession of the land following his repudiation of the oral agreement was unlawful, and that the respondents were entitled to a decree forfeiting the rights claimed by appellant.

■ While the note should have been returned by the respondents to the appellant when the contract was mutually canceled, the respondents' failure to return the note is not ground for reversal. The respondents could not recover on the note, and subsequent holders, taking after maturity of the note, would be charged with notice of defenses thereto.

■ To preserve his rights, in view of a clause which the trial court placed in the judgment, the entry of judgment against appellant in the amount of six thousand dollars on the bond executed to prevent the receivership is assigned as error. The judgment required that an accounting be rendered within thirty

days after the judgment, and the crop proceeds were awarded to respondents as follows:

"The amount hereof to be determined by order of this court and final judgment entered thereon; that in case the said defendant, Louis Miller, fails to so account and to deposit said moneys into the registry of this court within thirty days, plaintiffs are hereby awarded judgment against the defendant for the full sum of six thousand dollars."

The error complained of by appellant is that the bond given is conditioned "to account for the proceeds," and is not a penal bond on which a judgment should be entered for the full amount of the bond without proof of the amount due and owing under its terms. The accounting could not be made within thirty days, because the crops had not been accounted for by the marketing agency. The account has now been made, but no order of court has been made thereon. Respondents do not challenge the correctness of the report which has been filed by Miller, and agree that the judgment should be for $2,942.87, net proceeds of the sale of the crop. It is so ordered. In all other respects the judgment is affirmed.

The intervener, Silver & Furey, Incorporated, in its complaint alleged fifteen hundred dollars was due to it on a crop mortgage for money advanced by the intervener to Miller. Personal judgment for that amount was entered against Miller in favor of the intervener, who appealed from the judgment.

The facts upon which the intervener bases its claim are as follows:

The intervener is the real estate agency that arranged the real estate contract between the Carters and Miller. Miller's note of April 26, 1927, for $1,590, payable to the intervener and secured by crop mortgage, was superseded by Miller's note dated June 8,

1927, for $1,500, payable to the intervener and secured by crop mortgage recorded June 13, 1927. Furey testified that the note represented money advanced to Miller to effect the sale and the commission earned in July, 1926. Furey testified:

"Q. In addition to $14,500 what, in addition to that, was the purchaser (Miller) to pay under that listing? A. The listing provides that the price to Mr. Carter was to be $14,500 net to him and the purchaser would have to buy 8,000 boxes at 14¾c per box f. o. b. the ranch, in addition to the purchase price. Q. Now in order to close this deal, did Silver & Furey put any money into the deal? A. We did. Q. How much? A. It was either just a little more than $700 or a little less. It was very close to $700 in actual cash that we put into the deal, that we gave to Mr. Vernon to close up the deal. Our commission represents about $800, and the rest is cash that Silver & Furey put into the deal to put the deal over."

From the intervener's testimony, it is clear that the fifteen hundred dollars claimed is for eight hundred dollars commission due from Miller under the agreement that the purchaser was to pay commission on the real estate contract of 1926, and seven hundred dollars cash advanced to Miller to aid in closing the deal.

▮ The intervener has made no appearance in this court—has filed no brief and presented no oral argument; therefore its appeal is dismissed.

MITCHELL, C. J., PARKER, MAIN, and FRENCH, JJ., concur.